I respectfully dissent. The record contains substantial evidence that Warrior was the agent of Deere for the purpose of fraudulent suppression.
The record contains substantial evidence that Warrior knew but did not disclose to the Englands that the inadequate size of the hydraulic system control valve was *Page 184 
causing the malfunction of the skidder and that Deere could supply a larger valve adequate to correct the problem. The record establishes that Deere had already discovered the defect and the solution, stocked the larger valve, and imparted this information to Warrior. The record also contains substantial evidence that Warrior was the agent of Deere for the purpose of disclosing such facts about Deere products in the course of selling Deere products to customers like the Englands and servicing Deere products for customers like the Englands.
The crucial admission by Deere comes from the testimony of Ronald Brass, the Deere corporate representative at trial:
 "Q. Let me ask it this way. Do you think it is the right thing to do to tell people, your customers, the truth about your skidders?
 "A. We communicate to our customers through our dealers, through the independent dealers. We have no way in some cases of even notifying a customer. And in fact in this particular case my company didn't know that the Englands owned this machine."
(Emphasis added.) Two features of this admission are especially noteworthy. First, the admission reveals that Deere considered the customers, generically like the Englands, of the dealers, like Warrior, to be the customers of Deere itself. Second, the admission is stated in the classic principal-agent language: "We communicate to our customers through our dealers. . . ." (Emphasis added.) The admission as much as says that Deere communicates with its own generic customers like the Englands (even though Deere may not have known the Englands as specific customers) by and through agents of Deere like Warrior.
Next, the record contains substantial evidence, albeit disputed, that Deere controlled Warrior in its application of the larger valves to customers' skidders on a case-by-case basis as distinguished from the mere standard-policy basis claimed by Deere. Donnie Powell, service manager for Warrior, testified in pertinent part:
 "Q. And just so we'll get clear for the jury, John Deere determines what kits are mandatory and what kits are fix as fail; is that right?
"A. Yes.
 "Q. Warrior Tractor doesn't decide which kit is mandatory or which is fix as fail?
"A. No, sir.
 "Q. Donnie Powell doesn't decide which kits are fix as fail or mandatory?
"A. No.
 "Q. Now, on these mandatory kits such as product improvement programs I showed you, on those types of things, John Deere tells you to go out and fix a certain serial number range, is that right?
"A. Yes, sir.
 "Q. But on the fix as fail type kit, you don't fix those until the logger actually brings the machine in to you; is that right?
"A. Yes.
". . . .
 "Q. All right. I think that Mr. Goldston was asking you questions about if you went out and you placed a kit on a skidder that you didn't get approved by John Deere, that they wouldn't pay the claim?
 "A. They wouldn't have to. I'm not saying they wouldn't.
"Q. Have you ever had a situation —
 "A. No, I have never did anything without them okaying it first, unless it was, you know, mandatory with the serial *Page 185 numbers wrote out to do it anyway."
(Emphasis added.)
This testimony by Brass and Powell, in context, supports a reasonable inference that the failure of Warrior to disclose the need for and the availability of the larger valve to the Englands was, by the law of agency, the failure of Deere itself. Thus, I respectfully submit that the judgment of the trial court should be affirmed.